# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PWP XERION HOLDINGS III LLC,

      Plaintiff,

      v.

RED LEAF RESOURCES, INC., a Delaware corporation,

      Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2017-0235-JTL

## MEMORANDUM OPINION

Date Submitted: September 18, 2019
Date Decided: October 23, 2019

S. Michael Sirkin, Benjamin Z. Grossberg, R. Garret Rice, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Jonathan D. Schiller, Christopher D. Belelieu, Karen A. Chesley, Gary R. Studen, BOIES SCHILLER FLEXNER LLP, New York, New York; *Counsel for Plaintiff*.

Michael A. Pittenger, Timothy R. Dudderar, Mathew A. Golden, David M. Hahn, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Kenneth B. Black, Lauren A. Shurman, Wesley F. Harward, STOEL RIVES LLP, Salt Lake City, Utah; *Counsel for Defendant*.

**LASTER, V.C.**

Defendant Red Leaf Resources, Inc. ("Red Leaf" or the "Company") is a Delaware corporation seeking to develop technology to extract oil from shale. Under the certificate of designations that governs its Series A Preferred Stock, the consent of holders of a majority of the Series A shares is necessary for authorizing or effecting (i) any transaction for the benefit of an affiliate of a director of the Company, (ii) any material change in the Company's business plan, and (iii) any purchase or redemption of any equity interest in the Company. At all relevant times, plaintiff PWP Xerion Holdings III LLC ("Xerion") held a majority of the Series A shares, meaning that Xerion's consent was required before the Company could authorize or effect any of the foregoing actions.

In 2012, the Company entered into a set of joint venture agreements with TOTAL E&P USA Oil Shale, LLC ("TOTAL Sub"), an indirect, wholly owned subsidiary of TOTAL S.A. ("TOTAL Parent"). TOTAL Parent is one of a handful of supermajor oil companies in the world. For a company seeking to develop oil shale technology, an alliance with a supermajor like TOTAL Parent was obviously a significant development. Not surprisingly, the Company told its investors that the joint venture represented a material change in its business plan. As part of the parties' new relationship, TOTAL Sub purchased an equity interest in the Company and received the right to designate a member of the Company's board of directors (the "Board").

In 2016, TOTAL Sub notified the Company that it was exiting from the joint venture, before the planned completion date and without fulfilling all of its contractual obligations. To settle the ensuing dispute, TOTAL Sub agreed to pay the Company $85

million and return its equity interest. When the Board authorized the settlement, an officer of TOTAL Sub served as its director designee on the Board.

The Company initially asked Xerion to consent to the settlement. After Xerion declined, the Company and TOTAL Sub went forward without Xerion's consent. In an effort to sidestep the consent requirement, the Company obtained a non-reasoned, conclusory opinion from its outside counsel stating that TOTAL Sub and the officer of TOTAL Sub who served on the Board were not affiliates. The Company also tweaked the settlement so that TOTAL Sub would remain the owner of its equity interests in the Company unless and until Xerion consented to the settlement and released any claims it might have under a stockholders agreement and an investors' rights agreement.

The unwinding of the joint venture represented a material change in the Company's business plan. Before the settlement, TOTAL Sub was supporting the Company with financial, operational, and technological assistance. Together, the Company and TOTAL were pursuing a pilot project in Seep Ridge, Utah, designed to demonstrate the viability of extracting oil by heating shale in a single-use, earthenware capsule. After the settlement, the Company no longer had the support of a supermajor oil company. Moreover, the Company decided to pivot away from its pilot project in Utah and attempt instead to commercialize a multi-use, steel capsule that could extract oil from a different form of shale found in the middle eastern country of Jordan.

Xerion filed this lawsuit for breach of its consent rights. This decision grants Xerion's motion for summary judgment on the question of breach. For the reasons set forth herein, the Company breached Xerion's consent rights by failing to obtain Xerion's consent

before (i) authorizing and later effecting a transaction for the benefit of an affiliate of a director and (ii) authorizing and later effecting a material change in the Company's business plan. The Company did not breach its obligation to obtain Xerion's consent before authorizing a redemption.

## I.    FACTUAL BACKGROUND

The facts are drawn from the materials that the parties submitted in connection with the motion for summary judgment.[1] When considering Xerion's motion, any conflicts in the evidence are resolved in the Company's favor, and the Company receives the benefit of all reasonable inferences that can be drawn from the evidence. At this stage of the case, the court cannot weigh the evidence, decide among competing inferences, or make factual findings.

### A.    The Series A Issuance

The Company is a privately held Delaware corporation formed in 2006. For over a decade, the Company has sought to develop and commercialize technology for extracting

---

[1] Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "OX — at —" refer to exhibits that Xerion submitted with its opening brief. *See* Dkts. 145–46. Citations in the form "AX — at —" refer to exhibits that the Company submitted with its answering brief. *See* Dkts. 151–59. Citations in the form "RX — at —" refer to exhibits that Xerion submitted with its reply brief. *See* Dkt. 164. Pinpoint citations identify the internal page number of the exhibit or the last three digits of a control number. If an exhibit contained paragraph or section numbers, then the pinpoint citation uses the paragraph or section number. Citations to OX 25 and OX 26 refer to the complete versions of the draft agreements. *See* Dkt. 169. Citations in the form "AB __" refer to the Company's answering brief in opposition to Xerion's motion for summary judgment. *See* Dkt. 150.

oil from shale.

In 2010, the Company raised capital by issuing shares of Series A Preferred Stock. Xerion is a hedge fund that purchased and continues to own a majority of the issuance.[2]

During the negotiations over the terms of the Series A Preferred Stock, Xerion insisted on a "consent rights package" for "fundamental business events." OX 2 at '748. The final certificate of designations stated:

> For so long as shares of the Series A Preferred representing in aggregate more than 4.5% of the outstanding equity interests in the Corporation on a fully-diluted and as-if-converted basis are outstanding in addition to any other vote or consent required herein by law, the vote or written consent of the holders of more than 50% of the outstanding shares of Series A Preferred, voting together as a single class, shall be necessary for authorizing, effecting or validating the following actions (whether by merger, amendment, consolidation, reclassification, reorganization, recapitalization or otherwise) by the Corporation . . . .

OX 4 § 3(b)(i). The certificate of designations then listed thirteen different categories of actions. *See id.* Three are relevant to this case:

- "Any purchase or redemption of, or payment of any dividend or other distribution on, any capital stock or any other equity interest in the [Company] . . . ." *Id.* § 3(b)(i)(F) (the "Redemption Clause").

- "Any material alteration to, or change of, the business or business plan of the [Company] or any of its subsidiaries." *Id.* § 3(b)(i)(I) (the "Business Plan Clause").

- "Any transaction with or for the benefit of any director or officer (or their respective affiliates)." *Id.* § 3(b)(i)(M) (the "Interested Party Clause").

---

[2] Xerion purchased the Series A shares through Xerion Master Fund Ltd., which later transferred its shares to the plaintiff. The distinction between the entities is not important for purposes of this decision, which refers simply to Xerion.

Because Xerion purchased and has continued to hold a majority of the Series A shares, Xerion's consent was necessary for authorizing or effecting any transaction that fell within the scope of the Redemption Clause, the Business Plan Clause, or the Interested Party Clause.

## B.    The Joint Venture

In 2012, the Company entered into a set of joint venture agreements with TOTAL Sub, a Delaware limited liability company.[3] The sole member of TOTAL Sub was TOTAL E&P USA, Inc. ("TOTAL USA"), which in turn was a wholly owned subsidiary of TOTAL Parent. To reiterate, TOTAL Parent is one of the few supermajor oil companies in the world.

Under the terms of the Joint Venture Agreements, TOTAL Sub made an initial investment of $25 million in the Company and committed to provide personnel and advisory support for the Company's laboratory and scientific work. In return, TOTAL received (i) 16,667 shares of the Company's common stock, reflecting a 3.5% ownership stake in the Company, (ii) a warrant exercisable for additional shares of the Company's common stock, and (iii) a worldwide license to use the Company's EcoShale Technology. TOTAL Sub also received the right to designate a member of the Board.

---

[3] The Company and TOTAL Sub entered into five major agreements—a Purchase Agreement, a Joint Development Agreement, a Joint Operating Agreement, a Co-Ownership Agreement, and a License Agreement—plus other ancillary agreements. *See* AX 14; AX 20. The Company helpfully refers to them collectively as the "Joint Venture Agreements." *See* AB 9 n.3.

5

The Joint Venture Agreements provided that TOTAL Sub and the Company would each own a 50% interest in certain oil shale assets and projects located in Utah. The Joint Venture Agreements contemplated that the parties would develop the Utah projects in a coordinated manner and identify and acquire additional oil shale assets for joint exploration and development.

Before entering into the Joint Venture Agreements, the Company "planned to develop the EcoShale technology and move directly into commercial production." AB 11. Under the Joint Venture Agreements, the parties agreed first to pursue an "Early Production System Phase" (the "EPS Phase") during which the parties would develop and test the EcoShale technology at a site in Seep Ridge, Utah. AX 21 at 47. The Seep Ridge project sought to demonstrate the Company's ability to extract oil from shale by heating the rock inside a single-use, earthenware capsule. *See generally* AX 22, AX 23, AX 25, AX 26.

TOTAL Sub committed to invest $160 million towards developing the EcoShale Technology, representing 80% of the project budget. OX 9 at '367. If the technology proved commercially viable, then the parties would move on to a production phase. *See* OX 1 at '462; AX 10 at '739; AX 13 at '298.

The Company asked Xerion for its consent before entering into the Joint Venture Agreements. Xerion provided it.

## C.    The Company's Pursuit Of The Joint Venture

During the next four years, the Company's business plan consisted of pursuing the joint venture with TOTAL Sub. In 2013, a Board member suggested relocating the EPS Phase from Utah to Jordan, arguing that it would save the Company money. OX 10 at '056.

6

The Company's CEO opposed the idea, stressing that the Company needed to remain focused on "execut[ing] our business plan as defined by the Board and our JV Partner." OX 10 at '057.

In 2014, after the price of oil dropped significantly, the Company and TOTAL Sub agreed to reduce the size of the capsule and to extend the anticipated completion date of the EPS Phase by eighteen months. In May 2015, the Company and TOTAL Sub agreed to suspend all work for a period of two years to give the Company an opportunity to re-engineer a more cost-effective capsule. *See* AB 13; AX 23 at '179, '185; AX 28 at '730; AX 29 § 2; DeRidder Dep. 123–25. The re-engineered capsule would still be earthenware and single-use, but it would have a partially re-designed heating system. AX 23 at '185.

## D.     The Agreement In Principle

In May 2016, TOTAL Sub informed the Company that it wanted to exit the joint venture, citing concerns over the Company's technology, declining oil prices, and environmental issues. *See* AX 33 at '533 to '535; DeRidder Dep. at 138, 143, 147–48, 150–52, 154. The Company estimated that TOTAL Sub still owed $150 million in commitments to the joint venture through 2020. OX 11 at '712.

The Company decided to negotiate a settlement with TOTAL Sub. *See* OX 13 at '159. Around the time that negotiations began, TOTAL Sub replaced its Board designee with Pierre Germain, an officer of TOTAL Sub who was employed as Vice President for Business Development at TOTAL USA, the immediate parent of TOTAL Sub. Recognizing the conflicts of interest that would arise from Germain's affiliation with

7

TOTAL Sub, the Company asked Germain to recuse himself from any board discussions regarding the settlement negotiations. Germain agreed.

By January 2017, the parties had reached an agreement in principle that contemplated the Company releasing TOTAL Sub from all of its obligations under the Joint Venture Agreements in return for TOTAL Sub (i) paying the Company $85 million, (ii) forgoing all right, title, and interest in any assets related to the joint venture, and (iii) returning its 16,667 shares of common stock and the warrant to the Company (collectively the "Equity Interests"). *See* AX 39 at '695 to '696. During the settlement negotiations, both the Company's General Counsel and its outside counsel concluded that Germain's affiliations with TOTAL Sub meant that Xerion's consent would be required under the Interested Party Clause. *See* OX 16. The Company's General Counsel prepared a "voting matrix" for the Board, which noted that Xerion would need to approve the settlement. OX 17 at '094. When the Board met to approve the agreement in principle, the Company's General Counsel advised the Board that the Company "will need to obtain approval from [Xerion] . . . because Pierre [Germain] is serving as Director so the transaction may be considered to be a transaction for the benefit of an affiliate of a Director." AX 39 at '695.

The Board approved the agreement in principle subject to "receiving an affirmative vote in favor of the . . . settlement from [Xerion]." *Id.* at '696. Xerion's designee to the Board voted in favor of the resolution. *Id.* at '697.

## E. Xerion Objects To The Post-TOTAL Business Plan.

Also during January 2017, the Board considered what the Company's business plan should be after the termination of the joint venture. Without TOTAL Sub, the Company

8

lacked the funds to finish the EPS Phase. The Company's CEO believed that pursuing the EPS Phase was the Company's "only approved business plan." OX 34; *see* OX 23 at '554. Put differently, the Company had no "approved plan forward other than to advance the EPS." OX 35.

On January 28, 2017, the Company's CEO advised the Board that "hav[ing] completed a successful negotiation with TOTAL, . . . the [Company] management team is turning our full attention back to the task of executing our business plan to advance the Ecoshale technology." OX 23 at '555. Xerion's director designee objected, asserting that this course of action was not "funded, wise, or authorized by the board or the shareholders." OX 23 at '555. As he saw it, TOTAL Sub's exit meant there was "no funding or approved business plan." OX 23 at '255.

## F.     Xerion Withholds Consent.

On January 31, 2017, the Company formally asked Xerion for consent to the agreement in principle, explaining that its consent was required "[b]ecause a TOTAL representative is currently serving on the Board." OX 21 at '594.  Xerion declined.

The next day, the Company's General Counsel asked its outside counsel to "provide a legal memo or opinion (if possible) for our Board on the issue [*sic*] Series A not having a consent right for approval of the TOTAL deal if Pierre [Germain] resigns?" OX 23 at '552. Outside counsel agreed to provide the memorandum and suggested also analyzing whether the settlement was a "transaction" and whether TOTAL Sub was an "affiliate" of Germain. *Id.*

9

The Company's General Counsel also became concerned about whether the return of the Equity Interests triggered the Redemption Clause. He asked the Company's outside counsel to develop "a plan to get the TOTAL deal closed which assumes that we don't get Series A consent." OX 24 at '963. He suggested that to address the Redemption Clause, "we will simply carve the stock out of the deal." *Id.* at '964. Outside counsel agreed with this strategy and suggested that the Company could "carve it out and even deal with it as a separate redemption agreement." *Id.* at '963. Outside counsel viewed the Interested Party Clause as a "harder issue," noting that the firm could "come up with some arguments as to why [the Interested Party Clause] shouldn't apply, but the best one is still having [Germain] resign, which [TOTAL Sub] seem[s] unwilling to do." OX 24 at '963; *see* Waltman Dep. at 310–11.

Xerion offered to consent to the agreement in principle if the Company returned a negotiated amount of capital to its investors through a tender offer. AX 46 at '359; *see* AX 47 at '016; Kitchen Dep. 97–98. In response, the Board formed a committee consisting of all of the directors other than the designees of Xerion and TOTAL Sub (the "Committee") and gave it exclusive authority to negotiate with Xerion. AX 62 at '186. Xerion and the Committee failed to reach agreement because of objections from Questerre Energy Corporation ("Questerre"), a licensee of the Company's technology that was also the Company's largest common stockholder.[4]

---

[4] *See* OX 13 at '159 to '160; OX 41 at '001 to '002; AX 49 at '162; AX 51 at '167; AX 52; AX 53; AX 54; AX 55; AX 56; AX 57; AX 58; AX 59; Hood Dep. 183.

**G.      The Drafting Of The Settlement Agreement**

On February 7, 2017, TOTAL Sub sent the Company a draft settlement agreement. *See* OX 25. It called for TOTAL Sub to transfer various "Transferred Interests," including the Equity Interests, from TOTAL Sub to the Company. *See id.* § 2.2, Ex. A at 1, 6, 8. It also contemplated that the Company would deliver an opinion of counsel at closing stating that the Company had taken all corporate action necessary to effectuate the transaction, including obtaining any necessary stockholder approvals. *See id.* §§ 2.3(f), 3.1.

On February 21, 2017, the Company sent back a revised draft that removed the obligation to deliver an opinion of counsel. *See* OX 26 § 2.3. The Company's General Counsel asked in-house counsel for TOTAL Sub to "give some thought to whether and how [TOTAL Sub] may get comfortable closing this deal with no [Xerion] consent." OX 27 at '818.

The final version of the settlement agreement removed the Equity Interests from the definition of "Transferred Interests," meaning that the Equity Interests would not be transferred at closing. *See* OX 28, Ex. A at 1, 6, 8. The parties added a new Section 2.5, which states:

> As soon as reasonably practicable after receipt by Red Leaf of any required consent or approval, and conditioned upon the execution and delivery of the [Stockholders Agreement] Amendment and Release Agreement and the [Investors' Rights Agreement] Amendment and Release Agreement by [TOTAL Sub], Red Leaf, and all other parties required to execute such agreements, [TOTAL Sub] shall transfer and convey to Red Leaf, and Red Leaf shall accept, the Equity Interests pursuant to an assignment agreement substantially in the form of the Assignment.

11

*Id.* § 2.5. The final version of the settlement agreement restored the language requiring the Company to deliver a legal opinion at closing, but modified the requirement to address due authorization "[e]xcept for any stockholder approval required to complete the transactions contemplated by Section 2.5 of the Settlement Agreement." *Id.* at '017; *see id.* § 2.3(e).

## H. The Company And TOTAL Sub Enter Into The Settlement Agreement.

On March 13, 2017, the Committee considered whether to proceed with the settlement without Xerion's consent or pursue claims against TOTAL Sub. The directors decided to proceed with the settlement. *See* AX 63.

After the Committee met, the Company formally took the position that Xerion's consent was not necessary to proceed with the settlement. OX 30 at '742. The Company's outside counsel subsequently delivered a non-reasoned legal opinion which stated, without analysis, that the settlement did not violate any provision in the certificate of designations for the Series A Preferred Stock. *See* OX 28 at '014.

On March 22, 2017, the Board approved the settlement. The transaction was signed and closed on March 28. *See id.* at '949 (the "Settlement Agreement"). Xerion never gave its consent.

## I. The Company's Business Plan

Meanwhile, in early March 2017, Company management met "to review the draft of the [Red Leaf] Business Plan" that they had prepared in anticipation of the termination of the joint venture. OX 36. The EPS Phase that the Company had been pursuing with TOTAL Sub in Seep Ridge, Utah, sought to demonstrate the commercial viability of extracting oil from shale by heating the rock inside a single-use, earthenware capsule.

12

Questerre wanted management to "pivot" to an oil shale resource that Questerre owned in Jordan. OX 37 at '823. The single-use, earthenware capsule would not work with the Jordanian oil shale, and Questerre wanted management to develop a reusable steel capsule for commercial use in Jordan. *See* OX 38 at '116; OX 39 at '886; OX 42 at '002.

On March 20, 2017, two days before the Board voted on the Settlement Agreement, management circulated a presentation titled "Business Plan" to the Board. OX 40 at '558, '560. The presentation included an analysis of the oil industry, company-level forecasts, and a proposed budget and schedule for a hypothetical $56 million demonstration project. *See id.* at '558 to '562. The presentation also described the option of pursuing "a commercial project in a lower labor cost environment" such as Jordan, China, or Mongolia. *Id.* at '562 to '563.

Questerre and Company management "jointly outlined a plan to proceed with a focus on developing the EcoShale process for Questerre's Jordan project." OX 43 at '003. A week after the Board approved the Settlement Agreement, the Company's Vice President of Business Development and Investor Relations informed Questerre that Red Leaf was "ready to pivot to a Jordan focused game plan with the idea that the Jordan approach may be the best for Utah as well." OX 44.

On March 31, 2017, the Company sent a letter to its investors explaining that it had devoted time during the previous months "toward modifying our basic capsule design to work on very different oil shale resources in Jordan." AX 79 at '881. The letter identified problems with using the Company's previous design on the Jordanian resource and stated that in light of these problems, "our engineering team began to develop concepts for a

reusable capsule." *Id.* The Company added that "[s]everal promising design concepts for reusable capsules are working their way through early economic and engineering analysis." *Id.*

**J.      The Committee's Expanded Role**

On March 30, 2017, Xerion filed this action. In response, the Board expanded the Committee's authority to include overseeing the litigation "and any other matters that may involve or implicate a conflict or potential conflict between the Company and [Xerion]" or matters for which "it is in the best interests of the Company and its stockholders other than [Xerion] that deliberations, discussions or decisions be kept confidential from [Xerion]." AX 73 at '141.

The Company's General Counsel recommended that the Committee take charge of "certain discussions related to the Company's business plan." OX 29 at '772. On April 19, 2017, Company management presented the Committee with five "business plan options" that the Company could pursue following TOTAL Sub's exit from the joint venture. OX 49 at '177 to '178, '184 to '191; *see also* OX 50 at '001, '004 to '009. The members of the Committee were instructed to keep "the direction of the Company's business and business plan" confidential from Xerion's board designee. OX 49 at '177.

Company management recommended a business plan with the following components:

- "Suspend the EPS design work pending development of reusable containment concept,"

- "Test reusable containment concept for [Utah] commercial project,"

14

- "Support project development in Jordan,"

- "Pursue additional licensees in Jordan and elsewhere,"

- "Pursue new partners for Utah and international projects," and

- "Potential future tender agreements will be negotiated between shareholders."

*Id.* at '190 to '191. The Committee adopted management's recommendation. *Id.* at '178. A Company senior officer recorded the vote as, "Plan + Budget all in favor." OX 52 at '809 (formatting altered). He noted that a Committee member advised his fellow directors not to say that they had suspended the EPS Phase, but rather that they were "just moving forward" and "focusing on specific elements of plan." *Id.*

Since this meeting, the Company has not pursued any further development of the single-use, earthenware capsule that was the focus of the joint venture with TOTAL Sub. The Company instead has focused on commercializing a reusable steel capsule. *See* OX 53 at '067 to '069; Waltman Dep. 288–89. In June 2017, management recommended to the Board that the Company (i) use a reusable steel capsule at its Utah site and (ii) support licensees' projects in Jordan through lab tests, feasibility studies, and engineering design. AX 75 at '365. The presentation omitted any use of the term "business plan," and the Board did not vote on whether to adopt the recommendations.

## II. LEGAL ANALYSIS

Xerion seeks partial summary judgment determining that the Company breached the Interested Party Clause, the Business Plan Clause, and the Redemption Clause. Summary judgment may be granted only when "there is no genuine issue as to any material fact" and the "moving party is entitled to judgment as a matter of law." Ct. Ch. R. 56(c).

15

Summary judgment "must be denied if there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as to a material fact or the inferences to be drawn therefrom." *Vanaman v. Milford Mem'l Hosp., Inc.*, 272 A.2d 718, 720 (Del. 1970).

Summary judgment may be "appropriately granted even where 'colorable . . . or [in]significantly probative [evidence]' is present in the record, if no reasonable trier of fact could find for the [non-movant] on that evidence." *Haft v. Haft*, 671 A.2d 413, 419 (Del. Ch. 1995) (final alteration added) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). "The 'mere existence of a scintilla of evidence in support of the [non-movant]'s position' is not sufficient." *Haft*, 671 A.2d at 419 (quoting *Anderson,* 477 U.S. at 252).

## A.     Principles Of Contract Interpretation

The Interested Party Clause, the Business Plan Clause, and the Redemption Clause appear in the certificate of designations that governs the Series A Preferred Stock. "The rules of construction which are used to interpret contracts and other written instruments are applicable to corporate charters and certificates of designation." *Matulich v. Aegis Commc'ns Gp., Inc.*, 942 A.2d 596, 600 (Del. 2008). "Thus, if the charter language is clear and unambiguous, it must be given its plain meaning." *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 906 A.2d 114, 120 (Del. 2006). "[A] court interpreting any contractual provision, including preferred stock provisions, must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the

16

provisions of the instrument." *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

"Absent some ambiguity, Delaware courts will not destroy or twist [contract] language under the guise of construing it." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent." *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993). "Contract language is not ambiguous merely because the parties dispute what it means. To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) (footnote omitted).

**B.    The Interested Party Clause**

The Interested Party Clause makes Xerion's consent "necessary for authorizing [or] effecting" any transaction for the benefit of any affiliate of a Company director without Xerion's consent. The Company breached the Interested Party Clause by both authorizing and effecting the Settlement Agreement.

Under the plain meaning of the term, someone "affiliated" with a person or organization is "closely associated with" the person or organization, "typically in a dependent or subordinate position." *Affiliated*, Merriam Webster, https://www.merriam-

webster.com/dictionary/affiliated (last visited Oct. 14, 2019). As customarily interpreted, an officer or director of an entity is affiliated with that entity.[5]

Other definitions of affiliate reach the same endpoint by more explicitly incorporating the concept of control. Under Section 203 of the Delaware General Corporation Law, "'[a]ffiliate' means a person that directly, or indirectly through 1 or more intermediaries, controls, or is controlled by, or is under common control with, another person." 8 *Del. C.* § 203(c)(1). The term "'control, including the terms 'controlling,' 'controlled by' and 'under common control with,' means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting stock, by contract or otherwise. . . ." 8 *Del. C.* § 203(c)(4). A stockholders' agreement that was one of the Joint Venture Agreements defined an "affiliate" as "any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, as such terms are used and construed under Rule 144 [of the Securities Act]."

---

[5] *See Sec. & Exch. Comm'n v. Longfin Corp.*, 316 F. Supp. 3d 743, 759 (S.D.N.Y. May 1, 2018) (describing a person's status as an "officer, director, or 10% shareholder" as "hallmarks of an affiliate status"); *SMSW Enters., LLC v. Halberd Corp.*, 2015 WL 1457605, at *10 (C.D. Cal. Mar. 30, 2015) ("Generally, an affiliate [under Rule 144] is either an officer or director of the company or someone who owns 10% of the issued and outstanding shares of stock."); *Trustcash Hldgs., Inc. v. Moss*, 668 F. Supp. 2d 650, 660 (D.N.J. 2009) ("Affiliates are most often officers, directors, or majority shareholders— people who exercise control and influence over the company's policies or finances.") (internal quotation marks omitted); *see also* Revision of Rule 144, Rule 145, and Form 144, Securities Act Release No. 7391, 1997 WL 70601, at *4–5 (Feb. 20, 1997) (observing that "[m]any practitioners . . . use [these] criteria as a guide").

OX 18 § 1. Like Section 203, Rule 144 defines "control" to mean "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.

Under these control-based definitions, an officer or employee of an entity is affiliated with that entity. An officer meets the definition because he is under the control of and accountable to the governing body of the entity he serves. *See Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 780 (Del. Ch. 2016) ("Officers . . . are agents who report to the board of directors in its capacity as the governing body for the corporation. . . . [O]fficers have a duty to comply with the board's directives."), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, --- A.3d ---, 2019 WL 3683525 (Del. Aug. 7, 2019). An employee is similarly under the control of and accountable to the entity that employs him. *See TD Ameritrade, Inc. v. McLaughlin, Piven, Vogel Sec., Inc.*, 953 A.2d 726, 736 n.37 (Del. Ch. 2008) (citing RESTATEMENT (THIRD) OF AGENCY § 7.07).

When the Board approved the Settlement Agreement, Germain served as an officer of TOTAL Sub, as Vice President for Business Development of TOTAL USA, and as a member of the board of directors of TOTAL USA. Through these positions, Germain was affiliated with TOTAL Sub and TOTAL USA under the commonly understood meaning of the term, which recognizes that an officer or director of an entity is affiliated with that entity. Germain was also affiliated with TOTAL Sub, TOTAL USA, and TOTAL Parent under the control-based understanding of the term. As an officer of TOTAL Sub, Germain reported to Jose Ignacio Sanz, the President and CEO of TOTAL USA and TOTAL Sub,

and German was under the control of Sanz for purposes taking action as an officer of TOTAL Sub. TOTAL USA was the sole member of TOTAL Sub, and as an officer of TOTAL Sub, Germain and TOTAL Sub were under the common control of TOTAL USA. As a result, (i) Germain was under the control of and affiliated with TOTAL Sub, (ii) both TOTAL Sub and Germain were under common control of TOTAL USA, and (iii) TOTAL USA, TOTAL Sub, and German were under the common control of TOTAL Parent. Under the control-based approach to affiliate status, Germain was an affiliate of TOTAL Sub, TOTAL USA, and TOTAL Parent.

Before it became advantageous to argue otherwise, both the Company's General Counsel and its outside counsel regarded Germain as an affiliate of TOTAL Sub and believed that Xerion's approval was necessary under the Interested Party Clause. *See* OX 16; OX 17 at '094; OX 20 at '695. After Xerion declined to consent, the Company's General Counsel asked its outside counsel to develop "a plan to get the TOTAL deal closed which assumes that we don't get Series A consent." OX 24 at '963. The Company's outside counsel responded that they could "come up with some arguments as to why [the Interested Party Clause] shouldn't apply," but the best solution was to have Germain resign before the vote on the Settlement Agreement. *Id*. Germain did not resign before the vote.

The Company now contends that because Germain did not participate in the day-to-day activities of TOTAL Sub and because he largely did not participate in the settlement negotiations, he should not be considered an affiliate of TOTAL Sub. The extent of Germain's participation is irrelevant to the affiliate inquiry. The Interested Party Clause establishes a bright-line rule that requires Xerion's consent for any transaction with an

20

affiliate of a director, whether that director participated in the transaction or the day-to-day activities of the affiliate.

The Company also contends that Germain did not receive instructions from TOTAL Sub on how to vote, so he could not be under TOTAL Sub's control for purposes of determining affiliate status. There is evidence that TOTAL Sub did provide Germain with instructions about how to vote. *See* Germain Dep. 44. But whether Germain actually received instructions is immaterial. Germain was an officer of TOTAL Sub and an employee and officer of TOTAL USA who served on the Board at their pleasure. If TOTAL Sub or TOTAL USA disagreed with Germain's decisions, he could be removed.

The Company breached the Interested Party Clause because when the Settlement Agreement was approved and virtually all of the transactions it contemplated were completed, Germain was both a director of the Company and an affiliate of TOTAL Sub (as well as TOTAL USA and TOTAL Parent), and because the settlement benefitted TOTAL Sub (as well as TOTAL USA and TOTAL Parent) by allowing TOTAL Sub to exit from the Joint Venture Agreements on negotiated terms. Xerion separately argued that the Company breached the Interested Party Clause when approving the Settlement Agreement because it had provided deferred compensation to two officers under arrangements where their compensation would increase if the Company and TOTAL Sub reached agreement on a settlement. This decision need not reach that issue. The Company breached the Interested Party Clause by authorizing and later effecting the settlement without Xerion's consent while Germain served on the Board.

21

**C.     The Business Plan Clause**

The Business Plan Clause makes Xerion's consent "necessary for authorizing [or] effecting" any "material alteration to, or change of" the Company's "business or business plan." OX 4 § 3(b)(i)(I). The plain meaning of a "business plan" is "[a] document that explains what a company wants to do in the future and how it plans to accomplish those goals; specif[ically], a written proposal explaining a new business or business idea and usu[ally] covering financial, marketing, and operational plans."[6]

During the time that the Company and TOTAL Sub were parties to the Joint Venture Agreements, the Company's business plan consisted of pursuing the steps specified in those agreements, starting with the EPS Phase. OX 10 at '057. That phase involved pursuing a pilot project in Seep Ridge, Utah, for the extraction of oil from shale by heating it inside a single-use, earthenware capsule. TOTAL Sub committed to support the project with $160 million, representing 80% of the project budget. OX 9 at '367. TOTAL Sub also provided personnel, technological support, and operational assistance.

Before entering into the Joint Venture Agreements, the Company had been

---

[6] *Business Plan*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see Business Plan*, Cambridge Dictionary ("a detailed plan describing the future plans of a business"), https://dictionary.cambridge.org/dictionary/english/business-plan (last visited Oct. 14, 2019); *Business Plan*, Lexico ("A document setting out a business's future objectives and strategies                          for                          achieving                          them."), https://en.oxforddictionaries.com/definition/business_plan (last visited Oct. 14, 2019); *Business Plan*, Collins Dictionary ("a detailed plan for setting up or developing a business, especially       one       that       is       written       in       order       to       borrow       money"), https://www.collinsdictionary.com/dictionary/english/business-plan (last visited Oct. 14, 2019).

attempting to commercialize its technology immediately and on its own. Not surprisingly, the Company described its entry into the Joint Venture Agreements as a "significant change[]" in "the business plans of the Corporation." OX 8 at '764. By entering into the Settlement Agreement, unwinding the Joint Venture Agreements, and exiting from the joint venture, the Company materially changed its business plan.

The Company's conduct underscores its material change in direction. While the parties were negotiating the Settlement Agreement, Company management recognized the need to prepare a new business plan that accounted for TOTAL Sub's departure. *See* OX 34. As part of that effort, the Company's CEO developed and distributed a nineteen-page presentation entitled "Business Plan" that contemplated developing a smaller steel capsule and potentially pursuing a project in Jordan. *See* OX 40 at '558 to '562.

In April 2017, the Committee met to vote on several "business plan options" developed by management. *See* OX 49 at '477 to '478; *see also* OX 50. The Committee was voting on these items, instead of the Board, because the Board empowered the Committee to address matters where Xerion had conflicting interests. If the Company was simply continuing to pursue its existing business plan, there would have been no reason to route the discussions and decision to the Committee. Only a change in direction created a potential conflict with Xerion. The minutes of the Committee meeting reflect that the Committee decided to pursue a new business plan involving the commercial development of a reusable steel capsule that potentially could be deployed in Jordan, along with the suspension of the Company's prior EPS project in Utah. *See* OX 49 at '177 to '178, '190 to '191, '196 to '199. The change in technology and the potential change in project location

23

affected the Company's budget, technology development timeline, staffing needs, contracting needs, and day-to-day operations. As one member of the Board testified, "[I]f the business plan is the steps that you need to execute a particular outcome, yes, obviously . . . you are going to approach a reusable capsule in Jordan development different than continue with the current EPS project." Street Dep. 393–94.

In an effort to defeat summary judgment, the Company has claimed that its business plan "was and continues to be to develop, commercialize, and license its oil shale technology." AB 6. During discovery, the Company's directors and officers testified in lockstep about the Company's business plan, describing it at a similar level of generality using effectively the same nine words.[7] Based on this testimony, the Company argues that it has never changed its business plan.

The Company's argument confuses its "business" with its "business plan." The Business Plan Clause requires Xerion's consent for a material change to the Company's "business *or* business plan." OX 4 § 3(b)(i)(I) (emphasis added). The plain meaning of the term "business" is the "commercial enterprise" or the activity that the Company conducts.[8] A business plan is more than a headline-level description of the company's business. It

---

[7] *See* Bailey Dep. 86–87; Binnion Dep. 53, 100; Bocock Dep. 86–87; Lechtenberger Dep. 177; Lehnhof Dep. 142–44; Vogel Dep. 89; Waltman Dep. 63.

[8] *Business*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see Business*, Merriam-Webster ("a usually commercial or mercantile activity engaged in as a means of livelihood"), https://www.merriam-webster.com/dictionary/business (last visited Oct. 14, 2019).

describes how the Company will carry out its business and achieve its goals. Consistent with the plain meaning of the term, this court has recognized that a business plan is a confidential document precisely because of the sensitive strategic and financial information it contains. *See, e.g.*, *Mountain W. Series of Lockton Cos. v. Alliant Ins. Servs., Inc.*, 2019 WL 2536104, at *7 (Del. Ch. June 20, 2019). In this case, the Company designated information about its business plan as confidential. *See, e.g.*, RX 6 at '789. If the Company's business plan was nothing more than a single sentence summary of its business, then confidential treatment would be unavailable.

The Company's witnesses only testified in generic terms about the nature of its business, not its business plan. The contemporaneous documents show that the Company has always understood its business plan to include the steps needed to carry out its business. *See, e.g.*, RX 2; RX 3; OX 40; OX 50. The Company's newfound understanding of a general, non-specific "business plan" fails to raise a material dispute of fact.[9]

The Company breached the Business Plan Clause when it entered into the Settlement Agreement without Xerion's consent. It subsequently breached the Business

---

[9] *See i/m^x Info. Mgmt. Sols., Inc. v. Multiplan, Inc.*, 2014 WL 1255944, at *12 n.43 (Del. Ch. Mar. 27, 2014) (granting motion for summary judgment based on "objective documentary evidence" that could not be disproven by testimony); *Loppert v. WindsorTech, Inc.*, 865 A.2d 1282, 1285–86 & n.25 (Del. Ch. 2004) (granting summary judgment for plaintiff over defendant's "self-serving revelations" where documentary evidence established claim), *aff'd*, 867 A.2d 703 (Del. 2005); *see also Merck & Co. v. SmithKline Beecham Pharm. Co.*, 1999 WL 669354, at *47 (Del. Ch. Aug. 5, 1999) (post-trial decision refusing to credit testimony interpreting a contractual provision because "testimony cannot contradict the plain language of the agreement"), *aff'd*, 766 A.2d 442 (Del. 2000).

Plan Clause when the Committee approved a new business plan without Xerion's consent. Ever since, the Company has been continuing to breach the Business Plan Clause by pursuing a business plan that Xerion never approved. Summary judgment is granted in Xerion's favor as to the Company's past and continuing violations of the Business Plan Clause.

## D.    The Redemption Clause

The Redemption Clause makes Xerion's consent "necessary for authorizing [or] effecting" a purchase or redemption by the Company of its common stock or warrants. The Company has been careful not to effect a redemption of the Equity Interests, so the only question is whether the Company authorized a redemption without Xerion's consent. By definition, Xerion's consent is necessary for a redemption to be authorized. Because Xerion has not given its consent, the redemption is not authorized, and the Company has not violated this dimension of the Redemption Clause. Nor does the Settlement Agreement authorize the Company to proceed with the redemption without Xerion's consent. It instead conditions the Company's ability to proceed with the redemption upon receipt of Xerion's consent.

### 1.    Authorization.

The plain meaning of "authorize" is to "[g]ive official permission for or approval to."[10] Xerion argues that the Company has done everything it needs to do to give its official

---

[10] *Authorize*, Lexico, https://en.oxforddictionaries.com/definition/authorize (last visited Oct. 14, 2019); *see, e.g.*, *Authorize*, Merriam-Webster ("to endorse, empower,

26

permission for the redemption except for receiving Xerion's consent. In support of this observation, Xerion cites Section 2.5 of the Settlement Agreement, which provided as follows:

> As soon as reasonably practicable after receipt by Red Leaf of any required consent or approval, and conditioned upon the execution and delivery of the [Stockholders Agreement] Amendment and Release Agreement and the [Investors' Rights Agreement] Amendment and Release Agreement by [TOTAL Sub], Red Leaf, and all other parties required to execute such agreements, [TOTAL Sub] shall transfer and convey to Red Leaf, and Red Leaf shall accept, the Equity Interests.

OX 28 § 2.5. As Xerion points out, this language is mandatory and leaves no room for reconsideration, re-authorization, or re-approval once the "required consent or approval" is received. But this language also conditions the Company's performance on receipt of Xerion's consent. Until that is provided, the Company is not authorized to proceed with the redemption.[11]

Xerion also points out that under Section 2.3 of the Settlement Agreement, the Company was obligated to deliver to TOTAL Sub at closing resolutions from the Board "authorizing the execution, delivery, and performance by Red Leaf of this Agreement and

---

justify, or permit by or as if by some recognized or proper authority"), https://www.merriam-webster.com/dictionary/authorize (last visited Oct. 14, 2019); *see also* Waltman Dep. 126.

[11] Section 2.5 also conditions the redemption on TOTAL Sub, Red Leaf, and other parties providing releases. This decision need not express any view on whether the inclusion of this condition subsequent would enable the Company to argue that the redemption was not fully authorized, separate and apart from the Company's obligation to obtain Xerion's consent.

all documents required to be executed and delivered by Red Leaf in accordance with this Agreement, and the releases, covenants, and transactions contemplated hereby and thereby." *Id.* § 2.3(d). Compliance with this covenant meant that the Board had authorized the transactions. It did not mean that the Company had received all other consents necessary to authorize the transactions.

The most difficult provision in the Settlement Agreement for the Company is Section 3.1(c), where the Company represented flatly that the transactions that the Settlement Agreement contemplated were fully authorized:

> Authorization and Enforceability. The execution, delivery, and performance by Red Leaf of this Agreement and all documents required to be executed and delivered by Red Leaf in accordance with this Agreement, and the releases, covenants, and transactions contemplated hereby and thereby, have been duly and validly authorized by all necessary corporate action on the part of Red Leaf, including the board of directors or stockholder action, and the individual executing this Agreement on Red Leaf's behalf is duly authorized to do so. This Agreement and all documents required to be executed and delivered by Red Leaf in accordance with this Agreement have been duly executed and delivered by Red Leaf and this Agreement and such documents constitute the valid and binding obligation of Red Leaf, enforceable in accordance with its terms.

*Id.* § 3.1(c). By making this representation, the Company obligated itself contractually to TOTAL Sub and, as between those parties, assumed the risk of any inaccuracy. By doing so, the Company exposed itself to remedies for breach if TOTAL Sub sought to enforce the representation on the theory that Xerion's failure to provide consent rendered the representation inaccurate. Under those circumstances, it is conceivable that Xerion might have some type of claim against the Company for harm it suffered as a result of an inaccurate representation about due authorization made in violation of Xerion's contractual

28

consent rights, but those facts are not presented by this case. Here, Xerion claims that the Company breached the Redemption Clause by entering into the Settlement Agreement, even though the Settlement Agreement conditioned the Company's authority to proceed with the redemption on receipt of Xerion's consent. Because of the condition subsequent, the entry into the Settlement Agreement did not breach the "authorizing" dimension of the Settlement Agreement. The flat representation may well create risk for the Company vis-à-vis TOTAL Sub, but it does not mean that the redemption was authorized in violation of the Redemption Clause.[12]

Xerion has also observed that under Section 6.20 of the Settlement Agreement, the settlement became effective immediately upon TOTAL Sub's payment of the $85 million in cash, without any aspect of the parties' relationship being held in suspension pending further developments. Written in all caps and bolded for emphasis, Section 6.20 stated:

> **Effectiveness. SUBJECT TO RED LEAF'S RECEIPT OF THE CASH FEE, THE ASSUMPTION OF OBLIGATIONS, RELEASES,**

---

[12] In any dispute over the accuracy of Section 3.1(c), the Company perhaps would have arguments that its flat representation was not so flat. Separately, in Section 3.1(e), the Company represented:

> Except for any consent or approval required for the consummation . . . of the [return of the Equity Interests], no consent, approval, authorization or permit . . . is required for or in connection with the execution, delivery, and performance of this Agreement by Red Leaf or the consummation by Red Leaf of the transactions contemplated by this Agreement.

*Id.* § 3.1(e). The Company might well assert that the specific and qualified representation it made in Section 3.1(e) governed the authorization of the redemption of the Equity Interests, rather than the broader representation in Section 3.1(c) that addressed the transaction as a whole.

**COVENANTS, AND INDEMNITIES IN THIS AGREEMENT ARE EFFECTIVE IMMEDIATELY AND ARE NOT CONDITIONED UPON THE PERFORMANCE OF ANY OBLIGATION, THE CONSUMMATION OF ANY TRANSACTION, OR THE OCCURRENCE OF ANY OTHER EVENT, INCLUDING THE FUTURE PERFORMANCE BY EITHER PARTY OF ANY OBLIGATION CONTAINED IN THIS AGREEMENT OR THE FUTURE CONSUMMATION OF ANY TRANSACTION CONTEMPLATED BY THIS AGREEMENT. THE PARTIES RECOGNIZE AND AGREE THAT MUTUAL CONSIDERATION EXISTS ON THE EFFECTIVE DATE TO SUPPORT THIS PROVISION OF IMMEDIATE EFFECTIVENESS.**

*Id.* § 6.20. The inclusion of this provision supports the Company's view of the transaction. Because the redemption was not authorized and would not be completed until after Xerion gave its consent, the parties did not want anyone to be able to argue that the settlement had not been implemented. Section 6.20 makes clear that the principal aspects of the transaction had been implemented and completed. Once Xerion gives its consent and the redemption becomes authorized, that aspect of the transaction will also be completed.

Xerion's strongest interpretive argument criticizes the Company's approach for collapsing the distinction between "authorizing" and "effecting," rendering the former a nullity. As Xerion sees it, for the restriction on "authorizing" to have meaning, it must be possible for the Company to breach the authorization requirement without having obtained Xerion's consent. Put differently, by including the authorization of a redemption without Xerion's prior consent as a separate category of breach, the parties necessarily envisioned that a redemption could be sufficiently authorized to support a breach if Xerion's consent had not yet been obtained.

Xerion's reading is likely correct. There could be a set of facts in which the Company claimed to have authorized a redemption and was in the process of moving forward towards effecting it. Under those circumstances, Xerion could assert a claim for breach of the "authorizing" dimension of the Redemption Clause. But that is not the situation here. In this case, the Settlement Agreement conditioned the Company's authority to proceed with the redemption on receipt of Xerion's consent. The Company therefore did not violate the Redemption Clause by entering into the Settlement Agreement.

## 2. The Step Transaction Doctrine

In the alternative, Xerion turns to the step transaction doctrine. This doctrine "treats the 'steps' in a series of formally separate but related transactions involving the transfer of property as a single transaction if all the steps are substantially linked. Rather than viewing each step as an isolated incident, the steps are viewed together as components of an overall plan." *Noddings Inv. Gp., Inc. v. Capstar Commc'ns, Inc.*, 1999 WL 182568, at *6 (Del. Ch. Mar. 24, 1999) (internal quotation marks omitted); *accord Bank of N.Y. Mellon Tr. Co. v. Liberty Media Corp.*, 29 A.3d 225, 239–40 (Del. 2011). "The purpose of the step transaction doctrine is to ensure the fulfillment of parties' expectations notwithstanding the technical formalities with which a transaction is accomplished." *Coughlan v. NXP B.V.*, 2011 WL 5299491, at *7 (Del. Ch. Nov. 4, 2011). "The step-transaction doctrine applies if the component transactions meet one of three tests." *Liberty Media*, 29 A.3d at 240.

"First, under the 'end result test,' the doctrine will be invoked 'if it appears that a series of separate transactions were prearranged parts of what was a single transaction, cast from the outset to achieve the ultimate result.'" *Id.* (quoting *Noddings*, 1999 WL 182568,

31

at \*6). "Second, under the 'interdependence test,' separate transactions will be treated as one if 'the steps are so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series.'" *Id.* (quoting *Noddings*, 1999 WL 182568, at \*6). If the nominally separate elements have meaning "'only as part of the larger transaction,'" then the interdependence test is met and the step transaction doctrine applies. *Coughlan*, 2011 WL 5299491, at \*8 (quoting *Noddings*, 1999 WL 182568, at \*6). "The third and 'most restrictive alternative is the binding-commitment test under which a series of transactions are combined only if, at the time the first step is entered into, there was a binding commitment to undertake the later steps.'" *Liberty Media*, 29 A.3d at 240 (quoting *Noddings*, 1999 WL 182568, at \*6).

The step-transaction doctrine is inapposite because the question in this case is not whether nominally separate transactions are actually parts of a single transaction. The question in this case is whether the final aspect of a single transaction should be treated as if it were authorized even though the Company's ability to proceed was conditioned expressly on Xerion's consent. The Settlement Agreement is a single transaction—a settlement—that admittedly has multiple parts. One of those parts—the redemption—has not yet taken place because the Company has not yet authorized it. If the Company was claiming that the redemption was not part of the settlement, then the step-transaction doctrine would defeat that argument, most obviously because the Settlement Agreement would satisfy the binding commitment test. But that is not the issue. The question is rather whether the Company is currently authorized to redeem the Equity Interests in compliance with an otherwise binding commitment imposed by the Settlement Agreement. The

32

Settlement Agreement conditions the Company's obligation to redeem the Equity Interests on receipt of Xerion's consent, which is necessary for the Company to authorize the redemption. The step transaction doctrine cannot supply an authorization that does not yet exist. Once again, the Company did not breach the Redemption Clause when it entered into the Settlement Agreement without Xerion's consent.

## E. Other Arguments

The Company made other points in its papers that do not impede granting summary judgment on the issue of liability for breach of the Interested Party Clause and the Business Plan Clause. When discussing the Company's development of its technology and past interactions between the Company and Xerion, the Company pointed out a series of occasions when Xerion did not assert a consent right, even though it theoretically could have. The Company did not argue that Xerion waived its consent right, and Xerion's decision not to assert a consent right on previous occasions under different factual circumstances would not prevent Xerion from asserting its consent rights in connection with the settlement and subsequent developments. The Company also did not argue that Xerion's decision not to assert a consent right on previous occasions resulted in a course of dealing that should be used to interpret the consent rights. Because the consent rights are clear and unambiguous, resort to extrinsic evidence such as the parties' course of dealing is unwarranted.

The Company also argued repeatedly and at length that the Board acted in good faith and complied with its fiduciary duties when approving the settlement and making decisions regarding the post-settlement business plan. Xerion has not asserted a claim for

breach of fiduciary duty. Xerion has asserted a claim for breach of contract. The two legal frameworks are separate. A board can readily comply with its fiduciary duties while making a decision that breaches a contract, just as a board could opt to comply with a contract under circumstances where its fiduciary duties would call for engaging in efficient breach. *See Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *24 (Del. Ch. Apr. 14, 2017).

Along similar lines, the Company observed that Xerion's designee on the Board congratulated Company management on achieving the settlement and voted in favor of the initial resolution that approved the settlement subject to receiving Series A consent. A stockholder and its director designee occupy different roles, are subject to different decisional frameworks, and can have different views.

> Stockholders in Delaware corporations have a right to control and vote their shares in their own interest. They are limited only by any fiduciary duty owed to other stockholders. It is not objectionable that their motives may be for personal profit, or determined by whim or caprice, so long as they violate no duty owed other shareholders.

*Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 845 (Del. 1987). A director is a fiduciary who must seek loyally, in good faith, and with due care to pursue the best interests of the corporation and maximize its value for the ultimate benefit of the undifferentiated equity in the aggregate. *See ODN*, 2017 WL 1437308, at *17–22.

The fact that Xerion's director designee viewed the transaction as favorable for the Company when acting in his capacity as a director does not limit Xerion's ability to withhold consent for the same transaction in its capacity as a stockholder. This conclusion does not mean that the actions of Xerion's director designee are irrelevant to the ultimate

34

outcome of the case. During a later phase of the case, the views of Xerion's director designee may provide probative evidence on the quantum of damages. But this case has not yet reached the damages phase. The question presently is whether the Company breached Xerion's consent rights.

### III.       CONCLUSION

Partial summary judgment is granted in favor of Xerion as to the Company's breach of the Interested Party Clause and the Business Plan Clause. Xerion's motion is otherwise denied.